SHARP'S RIFLE MANUF'G CO. (SMITH v.). See Case No. 13,106.

SHATTUCK (HILLER v.). See Case No. 6,504.

---

## Case No. 12,714.

SHATTUCK v. MALEY.

[1 Wash. C. C. 245.] [1]

Circuit Court, D. Pennsylvania. April Term, 1805. [2]

MARITIME TORT—SEIZURE OF NEUTRAL VESSEL—EXCUSE—PROBABLE CAUSE OF SEIZURE—DAMAGES.

1. An officer of a public armed vessel of the United States, who made a seizure of a neutral vessel on the high seas, may excuse himself, by showing probable cause for having made it: but the ground of excuse should be very strong—stronger than in case of a capture of a neutral, by a belligerent.

[Cited in The Malaga, Case No. 8,985; Smith v. Averill, Id. 13,007; Averill v. Smith, 17 Wall. (84 U. S.) 93; McGuire v. Winslow, 26 Fed. 306.]

2. If such an excuse is made out, he is not liable for consequential damages; but otherwise, he is liable for all damages which have followed the seizure.

[Cited in The Malaga, Case No. 8,985.]

---

[3] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr., Esq.]

[2] [Affirmed in 3 Cranch (7 U. S.) 458.]

3. What will be deemed probable cause of seizure.

This was an appeal from a sentence of the district court, entered, pro forma, against the appellant. The appellant filed a libel in that court, stating, that being, in May, 1800, a naturalized subject of the king of Denmark, and resident at St. Thomas, and owner of the Mercator, an American built vessel, which he had bona fide purchased from the owner, in November, 1799; he, in May, 1800, put on board of her a cargo, and sent her to Jaquemel, or Port au Prince, in the island of St. Domingo, consigned to the captain, and properly documented to prove her neutrality. That on the 14th of May, when near the port of Jacquemel, she was met with by Captain Maley, commander of the United States' armed vessel the Experiment, and carried away, without having proceeded to adjudication; and prays a monition to compel him to do so. Maley appears, and answers under protest: admits the capture, but states, that the Mercator being an American registered vessel, owned and employed by citizens residing in America, sailed from Baltimore, and at the time of the seizure she was proceeding directly, or from some intermediate port, to Jaquemel, within the dependencies of France, and not to Port au Prince, agreeable to her letter of instructions. That the captain appeared to be an Italian, and his crew Portuguese and Italian. The captain did not show his burgher's brief. Shattuck was a citizen of Connecticut, and had never expatriated himself. That under all these suspicious circumstances, he took her as violating the non-intercourse law, and sent her, with an officer and men, to Captain Talbot, the commander on that station, lying off Cape Francois, for his orders. Six hours after she left the Experiment; she was captured by a British privateer, carried into Jamaica, libelled as belonging to France or Spain, and condemned. Of this, the libellant had notice; and his captain interposed a claim; but the vessel and cargo, (except the captain's part,) was condemned. An appeal was prayed, but was afterwards abandoned. The replication gives the proofs of the naturalization of Shattuck in 1789. or 1790. That the original destination was to Port au Prince, and so were the instructions; but just before sailing, verbal orders were given to touch at Jaquemel. That the libellant was the sole owner of the Mercator; that she was navigated as a real Danish vessel; she had on board, when seized, the king's passport, a certificate of measurement, muster-roll, a bill of sale, a burgher's brief of the captain, clearance, invoice, and bill of lading, duly attested as to the ownership and neutrality thereof; the captain's instructions, and the certificate on oath of sundry respectable merchants of the island of St. Thomas, attesting the citizenship of the replicant.

Mr. Duponceau. for the appellant, insisted: 1st. That the capture was not such as to ren-

der Maley a bona fide possessor; because, being properly documented, and no circumstance to render her suspected, he had no right to capture her. But if he did take her, it was his duty to send her immediately to the United States, for adjudication; and not to Cape Francois, out of her course to the United States, to be examined by the commodore. See 4 Laws U. S. [Folwell's Ed.] 166 [1 Stat. 578]. 2d. Even if he were a bona fide possessor, he has forfeited the protection of that character, by not resisting or remonstrating against the capture by the British, and by not afterwards endeavouring to defend the property in the court of admiralty. 4 C. Rob. Adm. 280. 3d. That the capture by the British was the consequence of his illegal conduct, and he is liable for all consequent damages. 1 C. Rob. Adm. 98, the case of The Betsey. 4th. The sentence in Jamaica is not conclusive. But if it be, the capture by Maley was illegal: as the Mercator, it is admitted, was unarmed. 5th. The claim at Jamaica, put in by the captain of the Mercator, does not bar the appellant's remedy. 2 C. Rob. Adm. 308.

The principal answer, by Dallas, for appellant, was, that the destination of the vessel differing from the written instructions to the captain; the former citizenship of Shattuck in this country; the instructions to the officers of the American navy; justified Maley in sending her in for examination. That it does not appear that the loss proceeded from his having done so.

WASHINGTON, Circuit Justice. Previous to the inquiry, whether the appellant has shown sufficient reasons to excuse him for having captured the Mercator, and to what degree his responsibility for having done so extends; there is a preliminary question, which deserves examination. It is, whether the commander of an armed neutral vessel, in the execution of a law of his country, can excuse himself for the violation of the rights of other nations, on the high seas; by showing sufficient ground to suspect, that the vessel thus captured, came within the scope of the law, and of his authority? In other words, whether probable cause, to any and to what extent, will excuse him, if the event should prove, that he judged wrong upon the fact which he has to decide? This question was very much agitated in the cases of Murray v. The Charming Betsey [2 Cranch (6 U. S.) 64], and The Flying Fish [unreported], in the supreme court; but did not receive a positive decision by the court.

The common law doctrine, as to torts, committed by officers acting under authority of law, is certainly very rigid. They act at their peril; and if they by mistake act wrong, there are but few cases in which they can be excused. But a reason may exist for this severity, in cases happening on land, which does not exist where similar cases occur at sea. In the former, the means

of obtaining correct information are more within the power of the officer; and the officer may, in most cases, if he doubts as to the fact, insist upon being indemnified by the party. But at sea this cannot be done.

The act of congress [2 Stat. 528], prohibiting the intercourse of the American merchants with the dependencies of France, considered strictly as a municipal regulation, unconnected with war; was binding upon our citizens, whether within the limits of the United States, or at sea. Those officers, who were in any manner charged with the execution of that law, were bound to obey it. The courts of this country, when cases arising under it are brought before them, must decide in such a manner as to give effect to the law: whatever may be the hardship which such decisions may impose upon the subjects of other nations. The law authorized our armed vessels to stop, and examine any vessel of the United States, on the high sea, which there may be reason to suspect to be engaged in traffic, contrary to the provisions of that law; and if it should appear, that she was sailing to any port within the territory of the French republic, contrary to that law; the commander of our vessel was to seize, and send the vessel engaged in such illicit trade, to the nearest port in the United States.

Every thing incident to the power here granted, and without which it could not be executed, is impliedly granted. But as the character of a vessel at sea, could not always be discovered but by her papers; it necessarily followed, that the commanders of the armed vessels of the United States, might, under the sanction of this law, stop the vessels of other neutral nations, in order to make this examination; for otherwise, it would be impossible to say, whether she was not a vessel belonging to American citizens, engaged in this illicit trade. The right of examination, essentially implies the right of judging, upon the evidence exhibited to them, whether the character assumed was real or covered. To hold the officer responsible, according to the event, would be to render the law nugatory; since few men would be found bold enough to insure the eventual solidity of his judgment, however strong he might suppose the grounds of it to be. But to excuse him from damages, if he should, in the execution of this limited authority, violate the rights of others; he must show such reasons as were sufficient to warrant a prudent, intelligent, and cautious man, in drawing the same conclusions. This is what is called probable cause; which excuses a belligerent for an unauthorized seizure of a neutral vessel; which he has reason to believe to be, in fact, an enemy, or engaged in a trade which renders her liable to confiscation. The principle of the two cases is the same; though the facts which would afford probable cause in one case, would not in another. For instance:

vessels belonging to neutral states, must not only act so as to entitle them to the protection of that character; but they must carry with them the documents necessary to satisfy any of the belligerent powers, who may demand it, that she is neutral. If this be not done, the neutral cannot complain, that he is arrested on his voyage, and exposed to all the losses which may result from an examination into the fact of his neutrality, in the courts of the captor. But as she is under no obligation to prove her neutrality to another neutral nation, it would be no excuse for her capture, by such neutral nation, that she did not exhibit the same proofs as a belligerant might have required. But, if, as in cases within the non-intercourse law, there be reasons to suspect the vessel to be the property of Americans, and engaged in a trade prohibited by the laws of the United States; it would be incumbent on the commander of such vessel, to free himself from those suspicions; and if the officer of the American armed vessel, had reasons, apparently well founded, to warrant the belief, that she came within the law, which he was bound to execute; I should hold him excused. But these reasons ought to be very strong, to entitle him to the character of acting bona fide; a character which ought most undoubtedly to protect him against any consequential damages, provided they are not produced by any subsequent misconduct of his own, or of those intrusted by him with the property.

These being the principles which ought to govern this case, how do they apply to it? The Mercator, when met with at sea, was found possessed of every necessary document to prove her to be the property of a Danish subject, and employed in a lawful commerce, not only in relation to the American government, but to the belligerent powers. I cannot discern, in the history of this transaction, a single circumstance, which ought to have excited a suspicion, that she was not, in fact, what she appeared to be. The certificate found on board, attested by the oaths of respectable men at St. Thomas, fully established the fact that Shattuck was a subject of his Danish majesty. The bill of sale proved the vessel to be Danish, not American property. The invoice and bill of lading afforded the usual and proper evidence of the voyage she was pursuing, and which she was authorized to pursue. These facts being established, what was it to this government, whether she was sailing to a port different from that mentioned in the written instructions? The circumstance of the captain's appearing to be a Frenchman, which has been mentioned as sufficient to excite suspicion, was of itself calculated to dispel it. For, is it likely that an American owner, engaged in this trade, would intrust his property to a French captain and consignee, in a vessel navigated entirely by foreigners? In short, I cannot imagine a case

so totally destitute of the means of being defended, as the present. Without inquiring into the subsequent conduct of the appellee, it is sufficient to say, that the taking the Mercator out of her way, was an unlawful act, and makes Captain Maley answerable for all the damages which have accrued.

This decision was affirmed in the supreme court. 3 Cranch [7 U. S.] 458.